**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

|                                   |     |                     |
|-----------------------------------|-----|---------------------|
| COLUMBUS LIFE INSURANCE COMPANY,  | )   |                     |
|                                   | )   |                     |
| Plaintiff,                        | )   |                     |
|                                   | )   | NO. 3:14–CV–01659   |
| vs.                               | )   |                     |
|                                   | )   |                     |
| ARCH INSURANCE COMPANY,           | )   |                     |
|                                   | )   |                     |
| Defendant.                        | )   |                     |
|                                   | )   |                     |

## OPINION AND ORDER

This matter is before the Court on the Motion for Partial Summary Judgment filed by Plaintiff Columbus Life Insurance Company ("Columbus"), on May 15, 2015 (DE #29), the Motion for Summary Judgment filed by Defendant Arch Insurance Company ("Arch") on June 8, 2015 (DE #34), and the Request for Hearing on Defendant's Motion for Summary Judgment filed by Arch on June 8, 2015 (DE #37). For the reasons set forth below, Columbus's Motion for Partial Summary Judgment (DE #29) is **GRANTED IN PART AND DENIED IN PART.** Arch's Motion for Summary Judgment (DE #34) is **DENIED,** and its Request for Hearing on its Motion for Summary Judgment (DE #37) is **DENIED.** Arch's Counterclaim (DE #27) is **DISMISSED.** Further proceedings will involve the following remaining issues: (1) the reasonableness of the settlement in the Jesta Action; (2) issues of fact regarding Columbus's claim for attorneys' fees in

litigating the instant action; (3) Columbus's claim of bad faith; and (4) the amount of Columbus's damages.

FACTS

For the purposes of these motions for summary judgment, the facts below are undisputed:

On March 1, 2008, Columbus entered into a contract for errors and omissions insurance coverage with Arch ("Policy") for the period of March 1, 2008, to March 1, 2009. Thereafter, the Policy was renewed annually through the policy period of March 1, 2012, to March 1, 2013. The Policy was a claims made and reported policy. Under the terms of the Policy, Columbus was a "Sponsoring Company" and a "First Named Insured," and as such, was entitled to coverage for vicarious liability claims arising out of the acts or omissions of its agents. (DE #31-1 at 2.)

The Villagra Action

On October 24, 2011, Victor and Eugenia Villagra ("Villagras"), filed a lawsuit against Angelo M. Papalia ("Papalia") and others in Connecticut state court entitled, *Villagra v. DiClemente* ("Villagra Action"). The complaint in the Villagra Action ("Villagra complaint") alleged that Papalia was the Villagras' trusted financial and tax advisor. Papalia allegedly recommended that the Villagras establish a "Section 419 Plan" under the Internal Revenue Code ("IRC"). Papalia allegedly

represented that under a Section 419 Plan, (1) a life insurance policy would be created for the Villagras' benefit, (2) contributions to the plan would be tax deductible, and (3) the Villagras would be permitted to withdraw money from the plan on a tax-free basis. (DE #31-4 at 6.) Following Papalia's recommendation, the Villagras allegedly established a Section 419 Plan, and subsequently contributed funds to it. The Villagra complaint alleges that Papalia knew that the Internal Revenue Service ("IRS") considered a Section 419 Plan to be an abusive tax shelter and a "listed transaction" for which contributions were not permissible deductions, and that Papalia intentionally withheld this information from the Villagras. (*Id*. at 8-9.) Papalia later advised the Villagras to "roll over" the Section 419 Plan to a new "Section 79 Plan," asserting that it had similar tax advantages as the Section 419 Plan. (*Id*. at 10.) The Villagras allegedly did so, and contributed funds to the Section 79 Plan thereafter. The IRS allegedly concluded that the Section 79 Plan was substantially similar to the Section 419 Plan, and thus was also considered a listed transaction. The Villagras were allegedly audited by the IRS, and anticipated the assessment of taxes, interest and penalties. The Villagra complaint also alleged damages in the form of early termination fees and surrender charges associated with terminating the insurance policies used to fund the plans.

The Section 419 and 79 Plans at issue in the Villagra Action were funded by two Columbus insurance policies. (DE #35-4 at 4.) At the time the Villagra complaint was filed, Papalia was contracted as an agent of Columbus, and was an Insured under the Policy. Papalia's counsel informed Arch of the Villagra Action in a letter dated October 31, 2011. (*Id*. at 2.) Arch found Papalia to be an Insured under the Policy in the 2011-12 policy period, and agreed to defend Papalia in the Villagra Action, subject to a reservation of rights under the terms and provisions of the Policy. (DE #31-5.)

The Notice Letter

On February 28, 2013, Papalia's counsel notified Arch that Papalia had established 419 Plans for other clients, which could give rise to additional claims similar to those made by the Villagras ("Notice Letter"). (DE #31-6 at 2.) The letter provided a list of 18 clients for whom Papalia had set up similar plans, including the "Jesta Rx Group." (*Id*. at 3.)

On May 22, 2013, Arch responded that the Notice Letter did not qualify as valid notice of a potential claim under the Policy. Arch requested a description of the circumstances in which Papalia first became aware of a potential wrongful act involving each of the 18 clients' Section 419 Plans, as well as other information. On July 9, 2013, Papalia's counsel notified Arch that Papalia had become aware of the potential claims after receiving the summons

and complaint in the Villagra Action "[o]n approximately October 24, 2011," when Papalia reviewed "prior actions performed to identify any other clients who may have or had similar plans." (DE #35-9 at 2 ("July 2013 Letter").)

On August 15, 2013, Arch responded to the July 2013 Letter, noting that Papalia had provided no circumstances detailing how Papalia had become aware of a wrongful act, or details regarding the wrongful act, involving each of his 18 clients. Arch also indicated that no claims had been made by any of these clients, and that it was without information to assess whether or not any such claim would qualify as "Related Claims" under the Policy. (DE #31-7 at 4.)

The Jesta Action

In August 2013, the Jesta Rx Group and its owners (together, the "Jesta Rx Group") made a monetary demand on Papalia, asserting that Papalia had misrepresented the tax treatment of the Jesta Rx Group's Section 419 Plan, causing them to incur damages. Papalia submitted this claim to Arch for coverage under the Policy. Arch denied the claim in October 2013, maintaining that it had no duty to defend or indemnify Papalia because he did not qualify as an agent or insured under the Policy. (DE #31-9 at 6.)

On November 26, 2013, the Jesta Rx Group and others filed a Texas state court action entitled, *Smeeding v. Papalia*, in which Columbus, Papalia, and several other insurers and individuals were

named as defendants ("Jesta Action"). (DE #31-8.) The petition in the Jesta Action ("Jesta petition") alleged that the defendants made misrepresentations to induce the plaintiffs into participating in 419 Plans, and later Section 79/Section 83 Plans (the "Plans"). The Plans, which were funded by the purchase of insurance contracts, were allegedly "just a clever way to sell millions of dollars['] worth of life insurance and generate significant commissions for the salesman and related profits for the insurance companies." (*Id*. at 4-5.) The insurer defendants allegedly provided their agents with training and marketing materials that "essentially provided a scripted presentation regarding the investment, the purported tax benefits of setting up [the Plans], and the funding such plans with life insurance policies specifically designed by the insurance companies for such purpose." (*Id*. at 20.) Each defendant was alleged to be a co-conspirator and "a cog in the machine" that induced the plaintiffs to participate in the Plans, and each defendant allegedly "knowingly aided and abetted" the other defendants. (*Id*. at 19.) The Jesta petition also alleged that Papalia was "acting as the agent of various insurance companies, including Columbus," and "was acting with either express, implied, apparent and/or ostensible authority and Columbus . . . subsequently ratified and benefitted financially from [Papalia's] acts, failures to act, representations, statements or conduct." (*Id*. at 18.)

The Jesta petition alleged that Papalia, as the Jesta Rx Group's trusted financial advisor, represented that the Section 419 Plan complied with the IRC and IRS, that contributions to the plan were tax deductible, and that the Jesta Rx Group could take out their money tax free after a number of years. (*Id.* at 28-29.) The Jesta Rx Group allegedly invested in the Section 419 Plan as a result of Papalia's representations. (*Id.* at 29.) After the IRS issued notices which made the Section 419 Plan a "listed transaction," Papalia allegedly transferred the Jesta Rx Group's Section 419 Plan to a Section 79/Section 83 Plan, without their informed consent. (*Id.* at 29-30.) Papalia allegedly continued to represent, among other things, that the contributions to these plans were tax-deductible. (*Id.* at 30.) According to the Jesta petition, the IRS informed the Jesta Rx Group that their plans were non-compliant, and assessed back taxes, penalties and interest. (*Id.* at 30-31.)

The Jesta petition asserts claims of fraud, negligent misrepresentation, negligence, unjust enrichment, "money had and received," and violations of the Texas Insurance Code against all defendants, including Columbus and Papalia. The fraud claim alleges that the "[d]efendants, individually and/or through their agents, knowingly made . . . false representations . . . ." (*Id.* at 60.) The negligent misrepresentation claim alleges that the "[d]efendants, individually and through their agents, and in

conspiracy with one another, and in aiding and abetting one another, negligently made false representations to Plaintiffs . . . ." (*Id*. at 63.) The Jesta petition incorporates these allegations into the other claims against all defendants. (*Id*. at 63, 67, 68.) It seeks damages in the form of back taxes, penalties, interest owed to the IRS, loss of investment, contribution to the plans, and several other types of damages.

Arch's Denial of Coverage

On April 1, 2014, Columbus submitted to Arch a claim for vicarious liability coverage under the Policy for the Jesta Action. On May 2, 2014, Arch denied the claim, and suggested that Columbus advise Arch if it disagreed with Arch's position. Columbus did not respond to Arch. Columbus settled the Jesta Action on April 2, 2015. Columbus subsequently filed the instant action against Arch.

Columbus now moves for partial summary judgment in its favor on Count I of its Amended Complaint (breach of contract), and on Arch's counterclaim for declaratory judgment. Columbus does not seek a determination of its bad faith claim, or the amount of its damages. Arch moves for summary judgment on all counts in Columbus's Amended Complaint, and on its Counterclaim for declaratory judgment.

SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in its own pleading, but rather must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). The party with the burden of proof on an issue can obtain a summary judgment "only where the evidence is so one-

sided that it points inescapably" in the movant's favor, and "every reasonable jury" would decide that the movant has met its burden of proof. *Thorne v. Member Select Ins. Co.,* 899 F. Supp. 2d 820, 824 (N.D. Ind. 2012) (citations omitted). If the non-moving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002).


DISCUSSION

Request for Hearing

At the outset, the Court will address Arch's Request for Hearing on its Motion for Summary Judgment. Pursuant to Local Rule 7-5, the Court may "grant or deny a request for oral argument or an evidentiary hearing in its discretion." N.D. Ind. L.R. 7-5(c)(1). Here, the parties' memoranda have sufficiently apprised the Court of the issues at hand, and the Court does not believe that a hearing is necessary. Therefore, the Court denies Arch's

Request for Hearing (DE #37), and turns to the merits of the parties' motions for summary judgment.

Choice of Law

In Indiana, "[a]n insurance policy is governed by the law of the principal location of the insured risk during the term of the policy." *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005) (citations omitted).[1]  Because Columbus is an insurance company organized under the laws of Ohio with its principle place of business in Ohio, Columbus maintains that Ohio law applies to the Policy.  While Arch asserts that it is possible that the law of other states apply to this matter, Arch does not identify any of those states.  Rather, Arch acknowledges that Ohio law "does not conflict on the main issues raised by this action." (DE #44 at 3.)  Courts "forego choice of law analysis when the parties agree on the law that governs a dispute and there is a reasonable relation between the dispute and the forum whose law has been selected." *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000) (citation omitted).  Because Arch does not contest the application of Ohio law, the Court will not undertake an independent choice of law analysis, and will apply Ohio law.

---

[1] A federal court sitting in diversity must apply the choice of law provisions of the forum state. *Storie v. Randy's Auto Sales, LLC,* 589 F.3d 873, 879 (7th Cir. 2009).

Arch maintains that the laws of other states should be considered regarding issues that have not been addressed by Ohio courts, or for which their precedent may conflict. Where the Supreme Court of Ohio has not addressed an issue of state contract law, a federal court attempts to ascertain how it would rule if it were faced with the issue. "The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Westport Ins. Corp. v. Coffman*, No. C2-05-1152, 2009 WL 243096, at *4 (S.D. Ohio Jan. 29, 2009) (citation omitted).

Analysis of Policy Language

In Ohio, "the construction of an insurance contract is a matter of law" to be determined by the court. *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999). When interpreting a contract, the court is "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The court is to examine an insurance policy as a whole and presume that the parties' intent is reflected in the language used in the policy. *Id*. The court looks to "the plain and ordinary meaning of language used in the policy unless another meaning is clearly apparent from the contents of the policy. When the language of a written contract is clear, a court may look no further than the writing

itself to find the intent of the parties." *Id.* (citations omitted). Where a contract is ambiguous, the court may consider extrinsic evidence to ascertain the parties' intent, but may not alter a lawful contract by imputing an intent contrary to that expressed by the parties. *Id.* at 1261–62 (citations omitted). "[A]n ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured." *Id.* at 1262 (citation omitted).

Notice under the Policy

Under Ohio law, an insured "generally has the burden of proving a loss and demonstrating coverage under the policy." *Sharonville v. Am. Employers Ins. Co.,* 846 N.E.2d 833, 838 (Ohio 2006). Here, the Policy is a "claims made and reported" policy, which requires that a claim be made and reported to the insurer within the policy period. Unlike occurrence policies, which provide coverage for acts done during the policy period (regardless of when the claim is made), claims made policies "are designed to limit liability to a fixed period of time." *United States v. Strip*, 868 F.2d 181, 187 (6th Cir. 1989) (Ohio law). Here, the Jesta Action commenced in November 2013, and Columbus reported a claim for coverage of the Jesta Action to Arch on April 1, 2014. Thus, Columbus's claim was made and reported after the policy period expired on March 1, 2013.

Columbus argues that its claim is nevertheless covered by the Policy because Arch received sufficient notice of the circumstances that resulted in the Jesta Action during the policy period. Condition VII.B of the Policy states:

> If during the Policy Period, an Insured becomes aware of a Wrongful Act . . . that could give rise to a Claim against an Insured and gives written notice to the Insurer prior to the end of the Policy Period of the following:
> 1.   the names of all potential claimants;
> 2.   the names of each Insured that committed the Wrongful Act . . .
> 3.   a detailed description of the Wrongful Act . . .
> 4.   the damage which has or may result from the Wrongful Act . . . and
> 5.   the circumstances by which the Insured first became aware of such Wrongful Act . . .
> then any Claim which subsequently arises out of such Wrongful Act . . . shall be treated as a Claim first made during the Policy Period.

(DE #31-1 at 18.) According to Columbus, the Notice Letter sent by Papalia's counsel on or about February 28, 2013, provided sufficient notice to Arch because it stated that Papalia had established other Section 419 Plans similar to the one at issue in the Villagra Action, and identified 18 other clients who would have claims similar to those asserted in the Villagra Action, including the Jesta Rx Group.

Arch argues that the Notice Letter failed to provide proper notice of the circumstances that resulted in the Jesta Action. Ohio courts have not addressed notice of circumstance provisions like Condition VII.B in claims made and reported policies.

However, Arch maintains that Ohio courts have found a "strict reporting requirement" for notice of actual claims made under such policies. *Wendy's Int'l, Inc. v. Illinois Union Ins. Co.*, No. 2:05-cv-803, 2007 WL 710242, at *9 (S.D. Ohio Mar. 6, 2007) (finding "that Plaintiffs were required to strictly comply with the notice provision" of the claims made and reported policy); *Certain Underwriters at Lloyds of London v. Jeff Wyler Dealer Group, Inc.*, No. C-1-05-572, 2007 WL 1989836, at *6-*7 (S.D. Ohio July 9, 2007) (citing *Wendy's* with approval). Arch cites other jurisdictions that have held that "[t]he proper focus of the district court's inquiry is whether the insured has *objectively* complied with such a notice provision." *LaForge v. Am. Cas. Co. of Reading, Pa.*, 37 F.3d 580, 584 (10th Cir. 1994) (finding information contained in the insured's renewal application was insufficient to constitute notice under the policy) (emphasis in original; citation omitted).

Arch asserts that the Notice Letter did not objectively comply with Condition VII.B by providing adequate and specific information regarding acts that may result in a claim. It maintains that the Notice Letter was vague because it did not explain why Papalia's 18 clients might pursue claims against him, or that these clients had purchased Columbus policies. Moreover, nothing in the Notice Letter or the subsequent correspondence from Papalia's counsel indicates that claims might be made against

Columbus. According to Arch, the lack of reference to Columbus in the Notice Letter establishes that it was not valid notice; if Columbus was an insured involved in the allegedly tortious acts resulting in the Jesta Action, Arch should have been notified.

Columbus insists that Ohio does not require objective compliance with notice provisions. Even if it does, Columbus maintains that it objectively complied with Condition VII.B because the Notice Letter identified the potential claimants, including the Jesta Rx Group, and explained that (1) Papalia was Columbus's agent, (2) the alleged wrongful acts stemmed from the creation of Section 419 Plans, similar to the Villagra Action, and (3) Papalia became aware of the potential claims while reviewing information to identify other clients who had plans similar to the Section 419 Plan at issue in the Villagra Action. While the Notice Letter stated that the amount of damages could not be ascertained at that time, Columbus asserts that the similarity of the potential claims to the Villagras' claim implicates damages similar to the damages asserted in the Villagra Action. Regarding the Notice Letter's lack of reference to Columbus, Columbus argues that Condition VII.B only requires the identification of "each Insured who committed the Wrongful Act," rather than all potential defendants. (DE #31-1 at 18.) According to Columbus, the notice provision did not require the identification of Columbus because it did not commit any wrongful act.

Even if the Notice Letter contained all of the information required by Condition VII.B, it does not satisfy Condition VII.B because Arch did not receive the Notice Letter within the appropriate policy period. Condition VII.B clearly and unambiguously requires that "[i]f during the Policy Period, an Insured becomes aware of a Wrongful Act," the insured must notify Arch of the wrongful act "*prior to the end of the Policy Period*" in order for a subsequent claim arising out of the wrongful act to be treated as a claim first made during the policy period. (*Id.* (emphasis added).) In the July 2013 Letter, Papalia admitted to learning of his other clients' potential claims after receiving the summons and complaint in the Villagra Action in October 2011. However, Arch was not notified of these potential claims until February 2013, when Papalia's counsel sent the Notice Letter.

Columbus asserts that Papalia's delay in reporting the potential claims is allowed by Condition VII.A of the Policy, which provides an extended reporting period where there is consecutive coverage. Condition VII.A states in relevant part,

> if continuous coverage is in effect pursuant to consecutive policies issued by the Insurer, a Claim may be reported to the Insurer in writing, as soon as practicable, during the policy period consecutive to and immediately following this Policy Period. . . . In such condition, the Claim will be deemed reported on the last day of the Policy Period.

(*Id.* at 17.) The plain language of Condition VII.A relates to the reporting of "Claim." "Claim" is defined in the Policy as "a

written demand for monetary damages received by an Insured or the Sponsoring Company." (*Id.* at 6.) The claim against Columbus did not arise until the Jesta Action was filed in November 2013, after the 2012-13 policy period expired. The Notice Letter did not notify Arch of any "Claim," as that term is defined by the Policy. Rather, it attempted to notify Arch of the potential claims of Jesta Rx Group and other Papalia clients. Because Condition VII.A does not address potential claims, it does not apply here.

Despite discovering the potential claims of Jesta Rx Group and other clients in 2011, Papalia did not notify Arch of them before the end of the 2011-12 policy period, as required by Condition VII.B. Rather, Papalia's counsel sent the Notice Letter to Arch in 2013. The Court therefore finds that the Notice Letter does not satisfy Condition VII.B.[2]

---

[2] Columbus also argues that Arch was not prejudiced by any purported defects in Papalia's notice, and therefore is not relieved of its obligation to provide coverage under the Policy. *Indiana Lumbermens Mut. Ins. Co. v. Conner Indus., Inc.*, No. CA2005-02-023, 2005 WL 3031742, at *4 (Ohio Ct. App. Nov. 14, 2005) (affirming finding that defendant failed to rebut the presumption of prejudice to the insurer as a result of its unreasonable delay in providing notice under an occurrence-based policy). Arch maintains that the issue of prejudice does not apply here because the Policy is a "claims made and reported" policy. The Court agrees. Ohio courts have held that the notice-prejudice rule does not apply where plaintiffs were required to strictly comply with the notice provision of a claims made and reported contract. *Wendy's*, 2007 WL 710242, at *9.

Related Claims Provision

Columbus argues that even if the Notice Letter was deficient, it is nevertheless entitled to coverage because the Jesta Action and the Villagra Action are "Related Claims" under the Policy. Arch maintains that the two actions are not Related Claims. The Policy provides that

> [a]ll Related Claims shall be deemed a single Claim, subject to a single Each Claim Limit of Liability, if covered, and such Claim shall be considered first made on the date the earliest such Related Claim is first made against an Insured, regardless of whether such date is before or during the Policy Period.

(*Id.* at 14.) The Policy defines "Related Claims" as:

> all Claims, whether made against more than one Insured or by more than one claimant, arising out of a single Wrongful Act . . . or a series of Wrongful Acts . . . that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

(*Id.* at 9.) While the Policy does not define "nexus," Ohio courts have relied on dictionaries to determine the definition of a word in a contract. *Westport,* 2009 WL 243096, at *7 (citation omitted). The Merriam-Webster on-line dictionary defines "nexus" as "a relationship or connection between people or things," and a "connection, link; also: a causal link; a connected group or series; center, focus." http://www.merriam-webster.com/dictionary/nexus (last visited May 4, 2016). Black's

Law Dictionary defines "nexus" as "a connection or link, often a causal one." Black's Law Dictionary (10th ed. 2014).

Columbus asserts that the Jesta Action and the Villagra Action are Related Claims because they share a common theme. In support, Columbus cites *LaValley v. Virginia Surety Company, Inc.,* 85 F. Supp. 2d 740 (N.D. Ohio 2000), which addressed a prior notice exclusion that applied to "any claim arising from any circumstance of which notice has been given under any policy in effect prior to or at the inception of the policy period." *Id.* at 743. The court found that insurance claims may arise from "the same general circumstances" where they share a "common theme," despite the fact that different parties had filed separate complaints seeking different relief. *Id.* at 747. It noted that the insured's "effort to point out facts that somewhat or partially distinguish" the claims was a "fruitless exercise" because the exclusion did not require that the claims be identical. *Id.* Arch argues that Columbus's reliance on *LaValley* is misplaced because it addressed a prior notice exclusion, rather than a related claim provision, which allows for the aggregation of claims. Columbus insists that prior notice exclusion in *LaValley* is sufficiently similar to the Related Claims provision at issue here because neither required a subsequent claim be identical to a prior claim.

Columbus cites other Ohio case law to support its position that the Villagra Action and Jesta Action are Related Claims. *See*

*Westport,* 2009 WL 243096 at *8–*9 (finding two separate legal actions were "logically connected" because they were based on the same event of the insured's legal malpractice of failing to register a business); *Schwartz Manes Ruby and Slovin, L.P.A. v. Monitor Liab. Managers, LLC*, 483 F. App'x 241, 246 (6th Cir. 2012) (finding that different acts of legal malpractice were "related wrongful acts" because the insured's alleged failure to litigate the former client's lawsuit was "certainly logically connected" to its failure to attend her trial); *Strip*, 868 F.2d at 189 (finding that claims against two different insureds were related because they were based on "the same events and occurrences"). Arch points out that the cases relied on by Columbus address claims based on the same services rendered by an insured to the same client, or claims that arose from the exact same event. However, the courts in these cases do not limit related claims to those by the same client or based on the same services or event. Even if they did, the definition of Related Claims at issue here explicitly includes claims made "by more than one claimant," and claims that have as a common nexus any "series of causally connected . . . events." (DE #31–1 at 9.) Thus, "Related Claims" explicitly includes claims involving more than one claimant and more than one event.

In arguing that the Jesta Action and the Villagra Action are not Related Claims, Arch focuses on case law interpreting the term

"related."[3]  Arch acknowledges that claims can be related if they arise from a nexus of logically or casually related facts. However, the connections between the claims must not be "so attenuated or unusual so as to make it objectively unreasonable to treat those claims as related." *Westport*, 2009 WL 243096, at *8 (relying on the commonly understood meaning of "related" because the term was not defined in the policy).

Arch relies on case law from other jurisdictions to assert that the Villagra Action and the Jesta Action are not Related Claims.  In *Financial Management Advisors, LLC v. American International Specialty Lines Insurance Company*, 506 F.3d 922 (9th Cir. 2007), the Ninth Circuit held that it did "not believe the term 'related' was intended to bar recovery whenever two parties are advised to invest in the same fund.  Nor are the [two] Claims logically related simply because both claimants blamed the same

_____

[3] Columbus asserts that Arch's current position regarding the term "Related Claims" conflicts with its prior position in *Lafayette Life Ins. Co. v. Arch Ins. Co.,* No. 4:10-CV-26 RM (N.D. Ind.), an action involving the same policy.  In that case, Arch maintained the position that "establishing a 'common nexus' does not require uniform facts.  Instead, the Wrongful Act or series of Wrongful Acts must have only a 'common nexus.'  A 'nexus' can be defined as 'a connection, tie, or link between individuals of a group, members of a series, etc.'"  (DE #40 at 18 (quoting DE #31-12 at 11 (quoting Webster's New University Unabridged Dictionary (2d Ed. 1983)).)  Here, Arch all but ignores the Policy's definition of "Related Claims."  However, it does acknowledge that "multiple claims will be deemed related under a policy if they arise from a nexus of logically or casually related facts."  (DE #35 at 9 (citing *Continental Cas. Co. v. Wendt,* 205 F.3d 1258, 1263 (11th Cir. 2000).)

financial advisor." *Id.* at 926. But there, the policy at issue did not define the term "related," so the Ninth Circuit looked to the Supreme Court of California's consideration of the term "related" in a different policy. *Id.* at 926 (citing *Bay Cities Paving & Grading, Inc. v. Lawyer's Mutual Ins. Co.,* 855 P.2d 1263 (Cal. 1993)). That policy language provided, "[t]wo or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim." *Id.* This language is narrower than the instant Policy's broad definition of "Related Claims." Moreover, the Ninth Circuit recognized that separate claims may be related where the insured gave the same advice to several parties to promote the same investment. *Id.* (citing *Wendt*, 205 F.3d 1258); *see also Eureka Fed. Sav. and Loan Ass'n v. Am. Cas. Co. of Reading, Pa.,* 873 F.2d 229, 235 (9th Cir. 1989) (noting that the Ninth Circuit "do[es] not foreclose the possibility . . . that loans to separate borrowers may be aggregated as a single loss in an appropriate fact situation"). Many of the cases cited by Arch found the claims at issue to be related. *See Wendt*, 205 F.3d at 1264 ("Though clearly this course of conduct involved different types of acts, these acts were all tied together because all were aimed at a single particular goal.") (Florida law); *Am. Med. Security Inc. v. Executive Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693, 707 (E.D. Wisc. 2005) (finding 39 lawsuits were "clearly 'related'" because

they were based on the insured's underwriting practices and business decision to market and sell certain policies as group health insurance).  The cases cited by Arch that found claims to be unrelated generally involve policies with narrower definitions than the Related Claims definition at issue here.  *See, e.g., Dormitory Authority of New York v. Continental Cas. Co.*, 756 F.3d 166, 170 (2d Cir. 2014) (defining "related claims" as "aris[ing] . . . out of a single wrongful act or related wrongful acts," and finding claims were unrelated where they involved different design teams, manifested themselves at different times and resulted in different types of damage requiring different solutions); *Fed. Deposit Ins. Corp. v. Mmahat,* 907 F.2d 546, 553-54 (5th Cir. 1990) (defining "related acts" as "acts which are logically or causally connected," and finding that "a single motive does not make a single act" where "discrete acts of malpractice resulted in discrete losses") (internal quotations omitted); *Eureka,* 873 F.2d at 234-35 (where policy provided that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more Directors or Officers shall be considered a single loss," holding that the existence of an aggressive loan policy was insufficient as a matter of law to transform disparate acts and omissions made by five directors in issuing loans to over 200 unrelated borrowers into a single loss); *Scott v. Am. Nat. Fire Ins. Co., Inc.*, 216 F. Supp. 2d 689, 693-

95 (N.D. Ohio 2002) (where policy provided "[c]laims alleging, based upon, arising out of or attributable to the same or related acts, errors, or omissions shall be treated as a single claim," concluding that the claims were not "related" because the attorney owed a separate duty to each investor and the investors' rights were independent from the corporation's rights); *cf*. *Westport*, 2009 WL 243096, at *8 (finding "the *Scott* court's interpretation of the word 'related' was not in accord with the 'natural and usual meaning' of the word").[4]

Columbus lists several commonalities demonstrating that the Jesta Action and the Villagra Action are Related Claims under the Policy.  Both actions allege that: (1) the plaintiffs relied on Papalia as their financial advisor; (2) Papalia recommended that the plaintiffs create a Section 419 Plan, and later, a Section 79 Plan; (3) the plans were funded by Columbus insurance policies; (4) Papalia represented that the plans would qualify for tax-advantaged treatment, contributions to the plans would be tax

---

[4] Arch also cites case law addressing the term "interrelated," a term that is not at issue here. *See, e.g., Sigma Fin. Corp. v. American Intern. Specialty Lines Ins. Co.,* 200 F. Supp. 2d 710, 720 (E.D. Mich. 2002) (finding that certain "claims arising out of [an] occurrence are not 'continuous, repeated, or interrelated' as contemplated under the policy"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ambassador Group, Inc.,* 691 F. Supp. 618, 623 (E.D.N.Y. 1988) (finding that it was "not readily apparent" that the claims at issue arose out of "the same or interrelated acts" as provided in the policy); *cf. Westport*, 2009 WL 243096, at *6 n.1 (noting that "[t]he term 'interrelated,' is more restrictive than the term 'related'").

deductible, and withdrawals from the plans would be tax-fee; (5) Papalia concealed from the plaintiffs the truth regarding their plans' tax status, and the likelihood that they would incur penalties; and (6) the plaintiffs were audited by the IRS, and were allegedly ordered to pay taxes, penalties and interest.

Arch downplays these common allegations, asserting that the only commonality between the Villagra Action and the Jesta Action is that they both involve the sale of life insurance by a Columbus agent as part of retirement plans. Arch argues that the actions are not Related Claims because: (1) they arose from different clients of Papalia, who received advice from Papalia at different times and locations; (2) the plaintiffs in the Villagra Action and the Jesta Action sustained unique losses and pursued their claims separately; (3) the plaintiffs established separate plans based on life insurance policies; and (4) the plaintiffs alleged different types of misconduct, that is, the Villagras alleged faulty financial and tax advice, while the Jesta Rx Group alleged a scheme perpetrated by insurers and their agents.[5]

The Court finds that the Villagra Action and the Jesta Action are Related Claims, as that term is broadly defined in the Policy. The Villagra Action and Jesta Action arose out of series of

_____

[5] Arch also asserts that the plaintiffs in the Jesta Action and the Villagra Action "had varying investment goals and requirements, and sought the agent's advice for their unique circumstances," but cites no support for this proposition.

wrongful acts "that have as a common nexus of any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." (DE #31-1 at 9.) Both actions arose out of Papalia's alleged recommendation that the Villagras and the Jesta Rx Group create the same type of tax-advantaged plan funded by Columbus insurance policies. In both actions, Papalia allegedly misrepresented the tax advantages of the plans, and concealed the truth about the plans. Both actions allege that following Papalia's recommendations resulted in IRS audits, unpaid taxes, penalties, early termination fees and other damages to the plaintiffs.

Despite Arch's objections, nothing in the language of the Policy requires that the source of the claims be identical in order to have "Related Claims." Related Claims includes claims "made . . . by more than one claimant." (DE #31-1 at 9.) The Policy does not require that different plaintiffs pursue their claims together in order to be deemed Related Claims. While the Villagra complaint and the Jesta petition assert different legal claims, these differences do not negate the common nexus between the two actions. *See generally LaValley*, 85 F. Supp. 2d at 747 (pointing out facts that somewhat or partially distinguish claims is a "fruitless exercise" where the policy does not require that the claims be identical); *see also Wendt*, 205 F.3d at 1264 ("The fact that these

acts resulted in a number of different harms to different persons, who many have different types of causes of action against Hall do not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract.").

Because the Villagra Action and the Jesta Action are Related Claims under the Policy, Columbus's claim for coverage of the Jesta Action is considered first made on the date the Villagra Action was first made against Arch, during the 2011–12 policy period.

Duty to Defend

Columbus asserts that Arch had a duty to defend it in the Jesta Action because the Jesta petition includes allegations of vicarious liability against Columbus.  In Ohio, an insurer's duty to defend is broader than and distinct from its duty to indemnify. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 874 N.E.2d 1155, 1159 (Ohio 2007).  "[W]hen all the claims are clearly and indisputably outside the contracted coverage," an insurer need not defend any action or claims within the complaint.  *Id.* at 1160.  An insurer must defend an insured in an action when the allegations state a claim that "potentially or arguably" falls within the insurance coverage. *Id.*

Columbus maintains that the allegations of its independent wrongdoing do not eliminate vicarious liability coverage under the Policy.  The vicarious liability provision of the Policy states in relevant part:

> The Insurer shall pay on behalf the Sponsoring Company
> all Loss which the Sponsoring Company shall become
> legally obligated to pay because of a Claim . . . solely
> arising out of a Wrongful Act of an Insured . . . solely
> in the rendering or failing to render Professional
> Services. *The Wrongful Act must be attributable solely*
> *to an Insured in the rendering or failing to render*
> *Professional Services and not due to any actual or*
> *alleged independent wrongdoing or bad faith of the*
> *Sponsoring Company*.

(DE #31-1 at 5 (emphasis added).) The defense and settlement provision of the Policy states in part that "[i]f a Claim made against the Sponsoring Company includes both covered and uncovered allegations, the Sponsoring Company and the Insurer agree to use their best efforts to agree upon a fair and proper allocation of the payment of Loss and Defense Costs for such Claim." (*Id*. at 5-6.)

In response, Arch acknowledges that the Policy "undeniably require[s] allocation of Loss and Defense Costs 'if' a Claim against Columbus Life includes covered and uncovered allegations, which are those that arise from its own independent wrongdoing or bad faith." (DE #35 at 14.) The Court agrees. Reading the vicarious liability provision and the defense and settlement provision together, the Policy clearly anticipates and accepts a duty to defend where a claim includes both covered and uncovered allegations. *Owners Ins. Co. v. Barone*, 832 F. Supp. 2d 804, 808 (N.D. Ohio 2011) (courts "must give the terms of the contract their plain and natural meaning, and give meaning to every paragraph,

clause, phrase, and word") (citation and internal quotations omitted); *cf. Lafayette Life Ins. Co.,* 784 F. Supp. 2d at 1042 (allegations of independent wrongdoing do not preclude vicarious liability coverage under this policy) (Indiana law). Thus, the Jesta petition's allegations of independent wrongdoing by Columbus do not preclude vicarious liability coverage under the Policy. The issue is whether the Jesta petition includes allegations of wrongdoing for which Columbus is vicariously liable.

"Under Ohio law, the scope of the allegations in the complaint determines whether an insurance company has a duty to defend the insured." *Westfield Cos. v. O.K.L. CAN Line*, 804 N.E.2d 45, 49 (Ohio Ct. App. 2003) (citation omitted). "[W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim." *City of Willoughby Hills v. Cincinnati Ins. Co*., 459 N.E.2d 555, 558 (Ohio 1984); *see Harrison*, 874 N.E.2d at 1160.

Arch argues that the Jesta Action is not covered by the Policy because it does not assert a single allegation against Columbus based on vicarious liability. Rather, Arch insists that the Jesta Action seeks to hold Columbus directly liable. In support, Arch points to several allegations of Columbus's independent

wrongdoing, as well as allegations that the defendants "aided and abetted" each other, and were "cog[s] in the machine" designed to defraud the plaintiffs. (DE #31-8 at 19.) Columbus responds that while no count specifically asserts vicarious liability, the Jesta petition alleges misconduct that is attributed to Columbus through its agency relationship with Papalia. As the Supreme Court of Ohio has acknowledged, the "most common form of derivative or vicarious liability is that imposed by the law of agency." *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 944 (Ohio 2009); *see Currier v. Penn-Ohio Logistics*, 931 N.E.2d 129, 140 (Ohio Ct. App. 2010) (vicarious liability is "liability based entirely upon the relationship between the parties").

The Jesta petition alleges that Papalia acted as Columbus's agent. (DE #31-8 at 18.) It further alleges that the defendants (including Columbus) "individually and/or through their agents" knowingly made false representations (*id*. at 60), and "individually and through their agents" negligently made false representations (*id*. at 63). The allegations that Columbus's alleged misrepresentations were based, at least in part, on the conduct of its agent Papalia raise "some doubt" as to whether the claims against Columbus were based in part on vicarious liability. *See Willoughby*, 459 N.E.2d at 558. As such, Arch had a duty to defend Columbus in the Jesta Action. Arch breached that duty when it refused to defend Columbus in the Jesta Action.

Defenses to Coverage

Arch insists that even if it breached its duty to defend Columbus, it is entitled to contest coverage based on other limitations and exclusions in the Policy. Arch admits that under Ohio law, an insurer that denies defense coverage to an insured without a sufficient basis cannot thereafter assert that the insured breached a condition requiring consent to a reasonable settlement. The Supreme Court of Ohio has explained:

> [W]here an insurer unjustifiably refuses to defend an action, leaving the insureds to fend for themselves, the insureds are at liberty to make a reasonable settlement without prejudice to their rights under the contract. By abandoning the insureds to their own devices in resolving the suit, the insurer voluntarily forgoes the right to control the litigation and, consequently, will not be heard to complain concerning the resolution of the action in the absence of a showing of fraud, even if liability is conceded by the insureds as a part of settlement negotiations.

*Sanderson v. Ohio Edison Co.,* 635 N.E.2d 19, 24 (Ohio 1994); *see Travelers Ins. Co. v. Motorists Mut. Ins. Co.*, 178 N.E.2d 613, 618 (Ohio Ct. App. 1961) (holding that an insurer's breach of its duty to defend "raises a right in the insured to make reasonable settlement of the lawsuit").

Arch argues that even if it breached its duty to defend Columbus in the Jesta Action, it may assert other defenses to coverage. Ohio courts have not specifically addressed this issue. Arch cites several other jurisdictions for the proposition that an insurer is not precluded from contesting coverage because it

breached its duty to defend. *See Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1229 (D. Col. 1999) ("an insurer is not precluded from contesting coverage when it has breached its obligation to defend its insured"); *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1149 (11th Cir. 1994) ("liability of an insurer depends upon whether the insured's claim is within the coverage of the policy . . . even when the insurer has unjustifiably failed to defend its insured in the underlying action") (Florida law); *Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1493 (5th Cir. 1992) ("[a]n insurer that breaches its duty to defend . . . does not necessarily owe its insured complete indemnification for a settlement the insured reached on its own") (Texas law); *Alabama Hospital Ass'n Trust v. Mut. Assur. Society of Ala.,* 538 So. 2d 1209, 1216 (Ala. 1989) ("failure of an insurer to defend a claim against an insured does not work an estoppel on the issue of coverage").

Columbus argues that Arch waived its defenses under the Policy by failing to defend the Jesta Action under a reservation of rights. In Ohio, an insurer "may defend [an insured] in good faith without waiving its right to assert at a later time the policy defenses it believes it has, provided that it gives its insured notice of any reservation of rights. . . . [T]he reservation of rights is obviously a *sine qua non* to avoiding a claim of estoppel or waiver." *Ins. Co. of N. Am. v. Travelers Ins. Co.*, 692 N.E.2d

1028, 1035 (Ohio Ct. App. 1997). "[E]stoppel acts as a bar against an insurer who refuses to defend an insured when the insured has relied on the insurer's conduct and was prejudiced in some material way." *GuideOne Mut. Ins. Co. v. Reno*, No. 01-CA-68, 2002 WL 857682, at *5 (Ohio Ct. App. Apr. 26, 2002).

In *Stoller v. Fidelity and Guaranty Insurance Underwriters, Inc.,* United States Fidelity and Guaranty Company ("USF&G") had contracted to defend and indemnify an employer for negligence, but not for intentional torts. No. WD-87-64, 1988 WL 81809 (Ohio Ct. App. Aug. 5, 1988) (citations omitted). An employee filed a complaint alleging an intentional tort claim and a negligence claim against the employer. *Id*. at *1. USF&G denied coverage, and the employer and employee subsequently settled the underlying action. They then sued USF&G, and the trial court found that USF&G had breached its duty to defend the employer. Because the trial court was unable to determine whether the parties had allocated the settlement between the negligence claim and intentional tort claim, it held USF&G liable for 50% of the settlement. *Id*. at *5.

On appeal, the Court of Appeals of Ohio explained that an insurer has the remedy of maintaining a declaratory action "for purposes of establishing its rights and obligations under a contract of insurance." *Id*. at *4. An insurer may "adjudicat[e] its duty to defend and/or indemnify its insured in a tort action brought by a third party, even where the underlying tort complaint

alleges conduct within the coverage of the contract of insurance."
*Id.* The court found that because USF&G "opted to simply deny
coverage and refused to defend, in breach of its duty . . , [it]
cannot now complain." *Id.* The court explained that "[t]he Supreme
Court of Ohio has ruled that an insurer who wrongfully disclaims
and refuses to defend an insured does so at its own risk." *Id.* at
*6 (citing *Aetna Cas. & Sur. Co. v. Buckeye Union Cas. Co.,* 105
N.E.2d 568 (Ohio 1952)); *see id.* at *5 (quoting the court's
syllabus in *Aetna,* 105 N.E.2d at 568, for the proposition that
where an insurer "wrongfully disclaims coverage and refuses to
defend or participate in settlement of an action which is brought
against the insured, such disclaimer is made at its peril"). The
court held that, based on these circumstances, "absent fraud or
bad faith, an insurer who wrongfully refuses to defend is liable
for the full amount of any reasonable settlement reached by the
insured even where one claim is within the policy and one claim is
outside policy coverage." *Id.* at *6. USF&G was ordered to pay
the full amount of the settlement award. *Id.* at *7.

   Despite Columbus's reliance on *Stoller*, Arch does not address
or otherwise distinguish this case. The *Stoller* court's
admonishments of insurers who breach their duty to defend, coupled
with its decision to hold the insurer liable for the settlement of
a claim that was indisputably outside of the policy's coverage,
indicates that Ohio would not follow the jurisdictions cited by

Arch, which allow an insurer to contest coverage after breaching its duty to defend. Rather, *Stoller* indicates that Ohio courts would hold that an insurer is estopped from denying coverage where it wrongfully disclaims coverage and refuses to defend or participate in the settlement of an action brought against an insured.[6] Therefore, the Court finds that because Arch wrongfully breached its duty to defend Columbus in the Jesta Action, it is estopped from denying coverage under the Policy.

Columbus also cites *Stoller* for the proposition that Arch is "on the hook for both covered and uncovered claims" because Arch wrongfully denied coverage of Columbus's claim. (DE #41 at 10.) However, in *Stoller*, the court was unable to disaggregate the settlement between the covered and uncovered claims. In contrast, the settlement agreement in the Jesta Action parses the settlement amount between the two types of claims against Columbus. It explicitly provides that 90% of the settlement amount is solely to

---

[6] The Court notes that other jurisdictions have found that an insurer that breaches its duty to defend may not deny insurance coverage. *See, e.g., Nat'l Am. Ins. Co. v. Progressive Corp.*, 43 F. Supp. 3d 873, 887 (N.D. Ill. 2014) ("[a]n insurer that violates its duty to defend is estopped from denying policy coverage in a subsequent lawsuit by the insured or the insured's assignee"); *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 241 (4th Cir. 2010) ("if an insurer improperly refuses to defend a claim, it is estopped from denying coverage and must pay any reasonable settlement—even if it made an honest mistake in its denial") (North Carolina law); *Carney v. Vill. of Darien*, 60 F.3d 1273, 1277 (7th Cir. 1995) ("[a]n insurer that breaches its duty to defend waives its right to later challenge coverage") (Wisconsin law).

resolve the Jesta Rx Group's claims based on Columbus's purported vicarious liability for the alleged acts and omissions of Papalia, and the remaining 10% is to resolve the claims based on the alleged independent wrongdoing by Columbus. (DE #31-11 at 6.) *See Bank One, N.A. v. Echo Acceptance Corp.,* 522 F. Supp. 2d 959, 979-80 (S.D. Ohio 2007) (declining to apply *Stoller* to find an indemnitor liable for a full settlement where the trial court could disaggregate covered claims from claims for which there was no duty to indemnify). Moreover, Ohio courts require that a settlement be "reasonable." *Sanderson,* 635 N.E.2d at 24; *Travelers*, 178 N.E.2d at 618-19 (noting a reasonable settlement is one which prudence and caution might dictate to be advisable, made in good faith, and not excessive in amount). The parties do not address the reasonableness of Columbus's settlement of the Jesta Action in any detail. Rather, Arch merely notes that the reasonableness of the settlement "is a topic for further litigation." (DE #44 at 14; *see also* DE #35 at 16 n.3.) As such, the Court will not address this issue here.

Attorneys' Fees

Columbus asserts that because Arch breached its duty to defend, Columbus is entitled to attorneys' fees in defending the Jesta Action. *Allen v. Standard Oil Co.*, 443 N.E.2d 497, 500 (Ohio 1982). It also seeks an award of its attorneys' fees in litigating

the instant action against Arch. Columbus asserts that it is entitled to attorneys' fees without proof of Arch's bad faith.

Arch acknowledges that Columbus may gain its reasonable defense costs incurred in the Jesta Action. (DE #44 at 15.) It contractually accepted the duty to defend Columbus against third-party lawsuits to which coverage potentially applied. By failing to defend Columbus in the Jesta Action, Arch breached its duty under the Policy. Thus, Columbus is entitled to an award of attorneys' fees incurred in defending the Jesta Action. *Westfield*, 804 N.E.2d at 54 (affirming award of legal fees for an underlying action where the insurer "contractually accepted the duty to defend [the insured] against third-party lawsuits to which coverage potentially applied").

Turning to Columbus's attorneys' fees incurred in the instant action, Columbus is only entitled to an award of such fees if Arch "acted in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons." *Id*. at 56. Ohio courts have awarded attorneys' fees where the insurer "'vexatiously' refused to pay a loss," and engaged in other "obdurate" behavior, such as a "stubborn propensity for needless litigation." *Id*. Columbus argues that Arch acted vexatiously and obdurately by denying coverage on a basis that this Court previously rejected under the same policy, and by taking opposing coverage positions regarding the Policy's "Related Claims" provision in order to deny coverage.

*See Lafayette Life,* 784 F. Supp. 2d at 1041-42. Arch maintains that Columbus is not entitled to its attorneys' fees in this action because when Arch refused to defend Columbus in the Jesta Action, Arch offered to reconsider its position if Columbus disagreed or possessed additional information. Columbus did not respond to Arch's offer; instead, it filed the instant action. The Court finds that that parties raise genuine issues of material fact as to whether Arch's conduct was obdurate or vexatious, such that it warrants an award of attorneys' fees incurred in litigating the instant action.

Arch's Counterclaim against Columbus

Columbus moves for summary judgment on Arch's counterclaim for declaratory judgment, which includes six counts. Count I asserts that Columbus is not entitled to coverage under the Policy because the Jesta petition does not allege that Columbus is vicariously liable for an insured's wrongdoing. As explained above, because there is "some doubt" as to whether the claims against Columbus in the Jesta petition were based in part on vicarious liability, Arch had a duty to defend Columbus in the Jesta Action. Count II asserts that Columbus is not entitled to coverage under the Policy because it failed to provide Arch with adequate notice of the claim, and because the Villagra Action and Jesta Action are not "Related Claims." As explained above, the Court finds that the Jesta Action and the Villagra Action are

Related Claims under the Policy. Counts III, IV, V, and VI assert that Columbus is not entitled to coverage under the Policy based on the definition of Loss and various policy exclusions. As explained above, the Court finds that Arch is estopped from asserting defenses to coverage because it breached its duty to defend. For these reasons, Arch's counterclaim is **DISMISSED**.


CONCLUSION

For the reasons set forth above, Columbus's Motion for Partial Summary Judgment (DE #29) is **GRANTED IN PART AND DENIED IN PART.** Arch's Motion for Summary Judgment (DE #34) is **DENIED,** and its Request for Hearing on its Motion for Summary Judgment (DE #37) is **DENIED.** Arch's Counterclaim (DE #27) is **DISMISSED.** Further proceedings will involve the following remaining issues: (1) the reasonableness of the settlement in the Jesta Action; (2) issues of fact regarding Columbus's claim for attorneys' fees in litigating the instant action; (3) Columbus's claim of bad faith; and (4) the amount of Columbus's damages.


**DATED:  May 17, 2016**              **/s/ RUDY LOZANO, Judge**
                              **United States District Court**